IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs July 11, 2017

## STATE OF TENNESSEE v. KENNETH FLEMING

**Appeal from the Criminal Court for Shelby County**
No. 14-03634        Chris Craft, Judge

_____

### No. W2016-01017-CCA-R3-CD

_____

The Defendant, Kenneth Fleming, appeals as of right from his convictions for two counts of aggravated robbery and one count of evading arrest. The Defendant argues that the trial court erred: (1) by giving an improper jury instruction and allowing the case to be presented to the jury when there was insufficient proof to establish venue and jurisdiction; (2) by failing to give a jury instruction on lost or destroyed evidence; (3) by allowing the State to enter a silver handgun and blue toboggan into evidence; (4) by not providing a curative instruction when a witness testified as to other crimes similar to the crime in this case; (5) by allowing the State to make improper comments during closing arguments and by giving an improper curative instruction to the jury; and (6) by sentencing the Defendant partially consecutively. Following our review, the judgments are affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which NORMA MCGEE OGLE and CAMILLE R. MCMULLEN, JJ., joined.

Terrell L. Tooten, Cordova, Tennessee (on appeal); and James Coleman and Laura Locke, Memphis, Tennessee (at trial), for the appellant, Kenneth Fleming.

Herbert H. Slatery III, Attorney General and Reporter; Nicholas W. Spangler, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Carla Taylor, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

FACTUAL BACKGROUND

This case arose following the December 26, 2013 robbery of the victims, Brandon Raupp and Joseph Lumley, at the Watkins Express Gas Station in Shelby County. Thereafter, the Shelby County Grand Jury charged the Defendant with two counts of aggravated robbery, one count of possessing a firearm as a convicted felon, and one count of evading arrest. See Tenn. Code Ann. §§ 39-13-402; -16-603; -17-1307. The Defendant proceeded to a jury trial for the two counts of aggravated robbery and one count of evading arrest. At the conclusion of the trial, the Defendant pled guilty to one count of possessing a firearm as a convicted felon. Co-defendant Darryl Gaither was charged similarly and tried jointly with the Defendant. The trial began in the Criminal Court for Shelby County on January 11, 2016.

Mr. Raupp testified that on December 26, 2013, he and Mr. Lumley were "head[ed] to play disc golf" at Shelby Forest and stopped at the Watkins Express Gas Station. Mr. Raupp testified that he and Mr. Lumley were traveling in Mr. Raupp's Mitsubishi Galant and that Mr. Raupp was driving. Mr. Raupp did not remember the exact time they stopped at the gas station but remembered that "[i]t was daylight." Mr. Raupp explained that when he and Mr. Lumley exited their vehicle, two men approached them and asked if the victims wanted "to buy some weed." Mr. Raupp and Mr. Lumley declined the offer and entered the store. Mr. Raupp explained that he went back outside to make sure his car doors and windows were locked and said that he noticed that the two men "were up on this hill" near the gas station. Mr. Raupp said that the men were "kind of standing there talking with each other and when they s[aw Mr. Raupp,] they started walking back down" the hill. Mr. Raupp went back inside the store where he and Mr. Lumley purchased drinks and snacks.

Mr. Raupp identified these two men as the Defendant and his co-defendant. When asked what the two men were wearing on the day of the incident, Mr. Raupp said that one man was wearing a blue toboggan and that the other was wearing a black toboggan. He also said that "one of them was wearing dark jeans and the other one was wearing light jeans."

Mr. Raupp explained that he and Mr. Lumley left the store and returned to his car. As they neared the car, the Defendant and co-defendant were standing on a corner in close proximity to Mr. Raupp's vehicle. Mr. Raupp testified that as he was unlocking his car door, the Defendant "c[ame] up on [Mr. Raupp] and pull[ed] the pistol out and [told Mr. Raupp] to get in the car." Mr. Raupp said that he sat "down in the car" and that the Defendant was "pointing the gun in [his] face saying to empty [his] pockets." Mr. Raupp explained that he removed a wallet, iPod, and a cell phone from his pockets. He stated that in his wallet, he "had a hundred dollars and a couple of gift cards."

Mr. Raupp said that the co-defendant went to the passenger side of the car where Mr. Lumley was standing. Mr. Raupp explained that the co-defendant instructed Mr. Lumley to get into the car, but the car doors were locked. Mr. Raupp said that the co-defendant "didn't pull his pistol out" but that he "kept . . . lifting up his shirt and showing it." Mr. Raupp stated that he unlocked the car doors, but Mr. Lumley did not get into the vehicle immediately. He explained that Mr. Lumley "was pretty upset[,] and he started walking around to the other guy" on Mr. Raupp's side of the car. Mr. Raupp testified that "the guy on [Mr. Raupp's] side started pointing his pistol at" Mr. Lumley. He described the pistol as "silver, like nickel plated." Mr. Raupp did not recall details about the other gun because the co-defendant "wouldn't pull [the gun] out, he just kept showing it, in his waistband."

Mr. Raupp said that after the Defendant, who was standing on the driver's side of the car, pointed the silver pistol at Mr. Lumley, Mr. Lumley "walked back around to the passenger side of the car." He said that Mr. Lumley pulled out his wallet and a bag of peanuts and threw his peanuts at one of the men. Mr. Raupp testified that one of the men told them that "they were going to burn" them and that he felt threatened by this. He explained, "I thought they were going to shoot us. . . . I was scared." Mr. Raupp said that the Defendant "reached in [the] glove box and pulled out the owner's manual to the car." He said that after that, the Defendant and co-defendant "took off, once they got what they wanted."

Mr. Raupp testified that the Defendant and co-defendant ran back up the hill. When asked what he did after the men ran away, Mr. Raupp explained "that he was pretty upset" and that Mr. Lumley suggested they drive after the men. Mr. Raupp said that he drove down the street in the direction the Defendant and co-defendant had run and that Mr. Lumley called the police. He stated that the Defendant and co-defendant "noticed us coming and so they pulled their guns out again and pointed them at us[.]" Mr. Raupp explained that he "turned down a side street and when [he] turned back around and came up, [the defendants] were gone." Mr. Raupp said that was approximately the time that he saw the police driving down another street to the left and that he met the police in a parking lot. Mr. Raupp said that he and Mr. Lumley got out of their car and "described to the police what [the Defendant and co-defendant] were wearing and what happened." He said that they were instructed to "follow another police officer back to the gas station to give a statement." Mr. Raupp explained that he and Mr. Lumley returned to the gas station and after arriving, got into the back of the police car to give a statement.

When asked how he described the incident to the police officers, Mr. Raupp responded, "[T]hey took my [i]Pod, my wallet, my cell phone, they were wearing you know, one had a blue toboggan, and one had a black toboggan, one had a black hoodie, . . . one had light colored jeans, and one had dark colored jeans." Mr. Raupp told the

officers that his assailants were two "[b]lack male[s,]" who were "probably between five ten and six" feet tall and each weighed "about a hundred and fifty pounds." Mr. Raupp explained that he and Mr. Lumley remained in the back of the squad car for approximately five minutes before officers brought two individuals back to the gas station. Officers brought the two men up to the windows of the squad car in which Mr. Raupp and Mr. Lumley were seated, and Mr. Raupp told the officers that they were the men who robbed him.

When asked how he was certain they were the same individuals, Mr. Raupp replied, "I recognized their face[s]. They had my property in their pocket." Specifically, it was a black iPod with "a couple of cracks in the top right screen and it had a picture of like a smiley face or something when you turned it on." Mr. Raupp said that after he identified the Defendant and co-defendant, he was told to return to the police station where he gave a statement about the robbery. The prosecutor showed Mr. Raupp a silver gun. Mr. Raupp said that the gun looked like the weapon the Defendant used during the robbery, and it was marked as an exhibit for identification purposes only.

Mr. Lumley gave a similar account at trial as Mr. Raupp. Furthermore, he identified the two defendants as the men who robbed him and Mr. Raupp that day. Mr. Lumley also testified that during the robbery, the Defendant demanded, "[G]ive [him] everything or he was going to burn [them]." Mr. Lumley said that he understood the Defendant to mean "[t]hat he was going to shoot [them] if [they] didn't give him what [they] had." When asked to describe the weapon that the Defendant had, Mr. Lumley responded, "It was a nickel plated .380, maybe a [.40 caliber], it wasn't a .22 or something small. It was a full sized Glock." Additionally, he testified that the co-defendant had a black gun during the robbery. Mr. Lumley testified that the co-defendant was wearing "a black hoodie" and "a blue toboggan," and that the Defendant was wearing a "black hoodie, a pair of solid black pants and a black toboggan." Mr. Lumley said that the Defendant had a small mustache and that the co-defendant was "younger, possibly [a] teenager."

Officer Derrick Gary testified that he was employed with the Memphis Police Department (MPD) and that he responded to an incident at the Watkins Express Gas Station on December 26, 2013. He stated that the incident happened at approximately "midday" and that he found the victims at a carwash in a shopping center located near the gas station. Officer Gary said that the victims told him

that they had just stopped at the gas station to buy some things before they went to Shelby Forest to play disc golf and were approached by two then unknown . . . black[] [males] that produced handguns and demanded their property. They gave me a list of items that had been taken from them, their

-4-

wallets, and an Apple [i]Pod and things of that nature. . . . I put them in the backseat of my car and they gave me a description of the two gentlemen responsible for the robbery.

Officer Gary testified that as part of his preliminary investigation, he "searched for additional witnesses" and "talked to the store clerk to see if there [was] any video" of the incident. However, the store clerk informed Officer Gary that the store had cameracs but that they were not operational at that time. Officer Gary said that "[o]nce he was given the confirmation that the subjects that were detained were the subjects responsible for the robbery," a supervisor was called to the scene and "everybody that was involved with the situation was taken to the investigative bureau for further investigation." Officer Gary said that he was with the victims for approximately one hour. Moreover, he stated that everything he testified to at trial occurred in Shelby County.

On cross-examination, Officer Gary was asked if it would "be a surprise to [him] if the owner of the [Watkins Express Gas Station] said that the cameras were up and had never not been operational." He responded that "it would not necessarily be a surprise to [him]. Those store owners [were] typically not cooperative with law enforcement."

Officer Langdon Hubbert testified that he was employed with the MPD on December 26, 2013, as a patrolman. Officer Hubbert said that he responded to a call and participated in the investigation involving the robbery at the Watkins Express Gas Station. Officer Hubbert explained that he helped to detain the co-defendant outside a house located near the gas station on "Gilly." Officer Hubbert "placed him into custody and . . . patted him down for any type of weapon." Officer Hubbert found no weapons and placed the man in the back seat of the police car. Officer Hubbert took the co-defendant to the gas station "where he was positively identified by both victims."

Officer Onrico Atkins testified that he was employed with the MPD and participated in a robbery investigation on December 26, 2013. Officer Atkins explained that he received "a call over the air via dispatch and [he] was one of the responding cars." He said that he arrived at the scene, and the two victims claimed that they had been robbed and "gave a location" for "where they believed the suspects had gone." Officer Atkins "went to the house in question" located on Gilly. Officer Atkins testified that he located the Defendant in a nearby "storage shed that was partially open[.]" Officer Atkins then identified the Defendant as the man he detained on the day of the robbery. The prosecutor showed Officer Atkins an item, and Officer Atkins identified it as the blue skullcap that he took from the Defendant the day of the incident. Counsel for the co-defendant requested a bench conference regarding the blue cap:

[Co-defendant's counsel]: Your honor, before this goes in I think I need to have some . . . clue about the chain of custody and how it gets from Officer Atkins to the present day.

. . . .

[Trial court]:  Well, . . . [Officer Atkins] said that's what it was and under [Tennessee Rule of Evidence] 901 it's sufficient if the witness says that's way it is, so he's authenticated it.

. . . .

[Defense counsel]:  It's a question of where it's been.  Is this just a general blue skullcap and there's no indication of who had custody over time. . . .

[Trial court]:  You're welcome to cross[-]examine [Officer Atkins] about it[,] but he gets to testify under oath that was the cap.  Now if you want to tell the jury it's not the cap, it may be someone else's cap and his cap was different, that's fine but there's no question about test results being invalid because it wasn't kept safely.  There's no reason for me to have to go through all that.  Now if there were fingerprints taken, DNA taken, serology taken, that's different, but he testified it was the cap.

Following the bench conference, the blue cap was entered into evidence.  Officer Atkins testified that the Defendant was patted down for weapons.  No weapons were located, but an iPod was found in the Defendant's "front right pants pocket."

Officer Atkins testified that he "returned the [D]efendant and the [i]Pod back to the scene of the robbery[,]" and one of the victims identified the iPod "as property taken from him" during the robbery.  Officer Atkins stated that he did not remember if the iPod was identified before or after the Defendant was identified.  During cross-examination, Officer Atkins said that he believed the iPod was returned to the victim.  Officer Atkins testified that the events occurred in Shelby County.

Lieutenant Matthew Pugh testified that he was employed with the MPD and that he participated in a robbery investigation on December 26, 2013.  He testified that he received a broadcast describing the suspects as "two . . . black[] [males] wearing dark clothing.  One of them had a black skullcap on and the other one had a blue skullcap on."  Lieutenant Pugh said that one of the victims "explained that they had followed the suspects to a house around the corner, so [Lieutenant Pugh] had [the victims] point out that house."  He testified that the house was located on Gilly, which was the first street located behind the store.  Lieutenant Pugh testified that as he approached the house,

-6-

[t]wo . . . black[] [males] ran out the back door and [he] heard them hit the fence and rattle the fence, and [Lieutenant Pugh] was in the driveway right beside the house when that happened and [he] observed them jump the fence and they took off running back westbound in between . . . two houses.

Lieutenant Pugh said that he got on the police radio and explained where the suspects were located. He stated that "within thirty seconds Officer Hubbert got on the radio and said he had one [of the suspects] in custody" and that "Officer Atkins . . . got on the radio and said he had the other one in custody on the next street over."

After learning that the two suspects had been detained, Lieutenant Pugh walked through the backyards of the area and "ran across [a] black bag and one of the suspect's skull caps[.]" He said that he found the bag behind a house located "in between the two streets of Corning and off the corner of Gilly[.]" He said that at that point, he joined Officer Hubbert and that he "had the suspects returned to the scene [of the robbery] for identification." When asked if he recalled what was in the black bag, Lieutenant Pugh replied, "[S]ome grayish black gloves and a hangun." Lieutenant Pugh identified a photograph of the house where he located the bag. Additionally, he identified the skullcap and the black bag containing the gloves and handgun, and these items were entered into evidence. Lieutenant Pugh also testified that all of the events occurred in Shelby County.

On cross-examination, Lieutenant Pugh was asked how he recognized the gun introduced into evidence. Lieutenant Pugh reiterated that "it was the weapon that was pulled out of the bag that day." He further explained that the gun was unique in that it was "chrome" or "nickel plated" and had "black electrical tape around the grip."

Hussein Mawani testified that he owned the Watkins Express Gas Station on North Watkins. He said that he had owned the gas station since 2003. Mr. Mawani identified a photograph of the inside of the store, which depicted "the register and the camera system[.]" He testifed that the system consisted of sixteen cameras. When asked if the system had ever been out of order or broken, he responded, "Not for too long. Even if it had, we would have repaired it quickly, but nothing [wa]s out of order for too long[.]" Mr. Mawani asserted that there had never been a time when all of the cameras were broken at once. Mr. Mawani also testified that the surveillance video recordings were erased automatically every two weeks. When asked if the police ever requested video footage from the store's camera system regarding incidents in the past, Mr. Mawani said, "[W]e have helped authorities when they needed camera footage for the outside of the store. And we have helped multiple times giving them video footage of outside of the store[.]"

At the conclusion of the trial, the jury convicted the Defendant of two counts of aggravated robbery and one count of evading arrest. The Defendant subsequently entered a guilty plea for one count of being a convicted felon in possession of a firearm.

*Sentencing Hearing*

The trial court held a hearing to determine the Defendant's sentence. The State argued for consecutive sentencing and for enhanced punishment. The State submitted the Defendant's presentence report as proof supporting its claims.

Defense counsel called the Defendant's mother, Phyllis Fleming, to testify on behalf of the Defendant. Ms. Fleming testified that she was a single parent to the Defendant and that the Defendant "had a lot of responsibility on him as a child because [Ms. Fleming] had to work." She testified that he was "raised in the church" but "somehow he slipped through the cracks." Ms. Fleming asked the court "to have mercy" on the Defendant. Ms. Fleming testified that if the Defendant were released, there were "ministers at [her] church" to mentor the Defendant. She also testified that she would help and support the Defendant.

At the conclusion of the hearing, the trial court imposed fifteen years for the aggravated robbery convictions, six years for the firearm conviction, and eleven months and twenty-nine days for the evading arrest conviction. The court ordered the six-year sentence to be served consecutively to the remaining sentences, which were to be served concurrently, resulting in a total effective sentence of twenty-one years.

The Defendant filed a timely notice of appeal. The case is now before us for our review.

ANALYSIS

*I. Sufficiency*

The Defendant contends that there was insufficient proof to establish venue and jurisdiction. Specifically, the Defendant argues that the trial court "erred when it gave an incorrect jury instruction and allowed the case to be presented to the jury when there was insufficient proof to establish venue and jurisdiction." The Defendant argues that because witnesses at trial failed to specifiy if they were referring to the Shelby County located in Tennessee, "the evidence was not sufficient to support a finding that the events occurred in Tennessee." The State responds that the Defendant waived any argument regarding the jurisdiction or jury instructions on venue because he did not "object to the instruction on venue and did not contest either the proof or instructions on venue in his motion for new trial." Furthermore, the State argues that plain error review is

unwarranted because each of the State's witnesses confirmed that the events in their testimony occurred in Shelby County, and "the [jury] instructions establish that the jury found the venue by at leas[t] a preponderance of the evidence." We agree with the State.

## A. Venue

The Tennessee Constitution provides that an accused must be tried in the county in which the crime is committed. Tenn. Const. art. I, § 9; see also Tenn. R. Crim. P. 18(a) ("Except as otherwise provided by statute or by these rules, offenses shall be prosecuted in the county where the offense was committed."). "Proof of venue is necessary to establish the jurisdiction of the court, but it is not an element of any offense and need only be proved by a preponderance of the evidence." State v. Hutcherson, 790 S.W.2d 532, 535 (Tenn. 1990); see State v. Young, 196 S.W.3d 85, 101 (Tenn. 2006) (holding that "[p]roof of venue is necessary to establish the jurisdiction of the court, but it is not an element of any offense"); see also Tenn. Code Ann. § 39-11-201(e) ("No person may be convicted of an offense unless venue is proven by a preponderance of the evidence.").

"Venue is a question for the jury," and can be established by circumstantial evidence. Young, 196 S.W.3d at 101-02 (citations omitted). To determine venue, the jury is permitted to draw reasonable inferences based on the evidence presented. Id. at 102 (citing State v. Johnson, 673 S.W.2d 877, 882 (Tenn. Crim. App. 1984)).

Here, the Defendant has waived any claims regarding venue because he failed to include any reference to venue in his motion for new trial. On appeal, the Defendant has couched his venue claim in terms of sufficiency of the evidence; however, venue "is not an issue that may be properly reviewed pursuant to a sufficiency of the evidence challenge." State v. Wayne Boykin, No. W2010-00719-CCA-R3CD, 2011 WL 4449671, at *7 (Tenn. Crim. App. Sept. 26, 2011). In Boykin, a panel of this court explained that "because venue is not an element of any offense, . . . it is not an issue that may be properly reviewed pursuant to a sufficiency of the evidence standard." Id. (citing Young, 196 S.W.3d at 101). Thus, the Defendant has waived appellate review of his issues regarding venue.

Additionally, we note that the Defendant argues that the jury instructions inaccurately stated that the jury must find venue beyond a reasonable doubt. While this instruction is incorrect, any error was harmless because finding venue beyond a reasonable doubt places a higher burden on the State than the correct burden of proof, by a preponderance of the evidence. See Tenn. Code Ann. § 39-11-201(e) ("No person may be convicted of an offense unless venue is proven by a preponderance of the evidence.").

## B. Territorial Jurisdiction

The Defendant's claim that there is insufficient evidence that the robbery events occurred in the State of Tennessee is effectively a challenge to the trial court's territorial jurisdiction. "It is elementary that before a court may exercise judicial power to hear and determine a criminal prosecution, that court must possess three types of jurisdiction: jurisdiction over the defendant, jurisdiction over the alleged crime, and territorial jurisdiction." State v. Legg, 9 S.W.3d 111, 114 (Tenn. 1999). "[T]erritorial jurisdiction, which recognizes the power of a state to punish criminal conduct occurring within its borders, is embodied in the constitutional right to a trial 'by an impartial jury of the county in which the crime shall have been committed.'" Id. (citing Tenn. Const. art. I; U.S. Const. amend. VI); see also U.S. Const. art. III, § 2 ("The trial of all crimes ... shall be held in the state where the said crimes shall have been committed."). Territorial jurisdiction must be proven beyond a reasonable doubt. See State v. Beall, 729 S.W.2d 270, 271 (Tenn. Crim. App. 1986).

"Territorial jurisdiction is a more fundamental concern than venue," thus we will consider the issue. See Boykin, 2011 WL 4449671, at *7 (waiving defendant's issue regarding venue in the context of sufficiency argument while considering territorial jurisdiction issue). The jury instructions given in this case regarding venue and jurisdiction read as follows:

> It is, therefore, incumbent upon the State, before you convict a defendant, to establish to your satisfaction, beyond a reasonable doubt, that the crime charged in this indictment was committed; that the same was committed within the County of Shelby and State of Tennessee before the finding of the indictment and that a defendant committed the crime in such a manner that would make him guilty under the law here defined and explained to you.

The jury instruction clearly states that the jury must determine beyond a reasonable doubt that the offense committed occurred within the State of Tennessee. Thus, the requirements of territorial jurisdiction have been met. Furthermore, multiple witnesses replied affirmatively when asked by the prosecutor, "[D]id this occur here in Shelby County?" This further supports the conclusion that the Shelby County referenced during trial is Shelby County, Tennessee. Therefore, the Defendant is not entitled to relief regarding venue or jurisdiction.

## II. Jury Instruction: Lost or Destroyed Evidence

The Defendant argues that the trial court erred by failing to include a jury instruction on lost or destroyed evidence regarding the victim's iPod and the security

camera recordings. The Defendant acknowledges that he raised no objection at trial but argues that he is entitled to plain error review. The State responds that the Defendant has waived appellate review of this issue by failing to request an instruction during trial and by failing to raise the issue in his motion for a new trial. The State further argues that plain error is not appropriate "because the [D]efendant did not articulate how the allegedly lost evidence in question—the victim's [i]Pod and security camera recordings from the crime scene—is exculpatory." Thus, the State argues that the Defendant failed to demonstrate an adverse effect on a substantial right or that review is needed to do substantial justice. We agree with the State.

The Due Process Clause of the Fourteenth Amendment to the United States Constitution and article I, section 8 of the Tennessee Constitution provide every defendant the right to a fair trial. To facilitate this right, a defendant has a constitutionally protected privilege to request and obtain from the prosecution evidence that is either material to guilt or relevant to punishment. Brady v. Maryland, 373 U.S. 83, 87 (1963). Further, the prosecution has a duty to turn over exculpatory evidence that would raise a reasonable doubt about a defendant's guilt. United States v. Agurs, 427 U.S. 97, 110-11 (1976).

In State v. Ferguson, 2 S.W.3d 912, 916 (Tenn. 1999), our state supreme court adopted a test for courts to use in determining whether the State's loss or destruction of evidence deprived a defendant of a fair trial. The first step in analyzing whether a defendant's trial was fundamentally fair "is to determine whether the State had a duty to preserve the evidence." Id. at 917. The State's duty to preserve evidence is "limited to evidence that might be expected to play a significant role in the suspect's defense." Id. at 917. This "materiality" standard requires proof that the evidence possesses an exculpatory value apparent prior to the destruction of the evidence and must "be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." Id.

Special instructions are given "to supply an omission or correct a mistake made in the general charge, to present a material question not treated in the general charge, or to limit, extend, eliminate, or more accurately define a proposition already submitted to the jury." State v. Cozart, 54 S.W.3d 242, 245 (Tenn. 2001), overruled on other grounds by State v. White, 362 S.W.3d 559 (Tenn. 2012). The Defendant never requested a special instruction on lost or destroyed evidence, either orally or in writing, and the issue was not presented in the Defendant's motion for new trial. Thus, the issue is waived. See Tenn. R. App. P. 3(e) (providing for waiver of issues not specifically stated in a motion for new trial); Tenn. R. App. P. 36(a) (stating that relief is not required if the party seeking it "failed to take whatever action was reasonably available to prevent or nullify the harmful effect of the error"); Tenn. R. Crim. P. 30(a) (envisioning that special requests for jury

-11-

instructions be made in writing). Our review is limited to one for plain error. See Tenn. R. App. P. 36(b) ("A final judgment from which relief is available and otherwise appropriate shall not be set aside unless, considering the whole record, error involving a substantial right more probably than not affected the judgment or would result in prejudice to the judicial process. When necessary to do substantial justice, an appellate court may consider an error that has affected the substantial rights of a party at any time, even though the error was not raised in the motion for a new trial or assigned as error on appeal.").

The doctrine of plain error only applies when all five of the following factors have been established:

(1) the record clearly establishes what occurred in the trial court;

(2) the error breached a clear and unequivocal rule of law;

(3) the error adversely affected a substantial right of the complaining party;

(4) the error was not waived for tactical reasons; and

(5) substantial justice is at stake; that is, the error was so significant that it "probably changed the outcome of the trial."

State v. Smith, 24 S.W.3d 274, 282 (Tenn. 2000) (quoting State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)). "An error would have to [be] especially egregious in nature, striking at the very heart of the fairness of the judicial proceeding, to rise to the level of plain error." State v. Page, 184 S.W.3d 223, 231 (Tenn. 2006).

In this case, there is no indication that the victim's iPod or any security camera recordings from the Watkins Express Gas Station would have been exculpatory for the Defendant. The Defendant failed to specify how such evidence would have aided in his defense. Furthermore, Officer Gary testified that there was no video recording of the robbery because the store clerk informed him that the camera system was not working that day. Accordingly, the plain error doctrine can afford no relief to the Defendant—no clear and unequivocal rule of law has been breached, no substantial right of the Defendant has been adversely affected, and substantial justice is not at stake. See Smith, 24 S.W.3d at 282. As raised, this issue is without merit.

### III. Authentication and Chain of Custody

The Defendant contends that the trial court erred in allowing the State to enter into evidence a silver handgun and a blue toboggan. The Defendant argues that neither the gun nor the toboggan were properly authenticated in accordance with Tennesee Rule of

-12-

Evidence 901. He further argues that the State failed to establish the chain of custody regarding this evidence. The State responds that challenges regarding the admission of the gun and toboggan are waived "because [the Defendant] did not preserve these issues in his motion for new trial." The State further argues that plain error review of this issue is unwarranted. We agree with the State.

Tennessee Rule of Evidence 901 provides that "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding by the trier of fact that the matter in question is what its proponent claims." Therefore, if the facts and circumstances regarding the evidence "reasonably establish the identity and integrity of the evidence," it should be admitted. State v. Cannon, 254 S.W.3d 287, 296 (Tenn. 2008). However, if the State's proof of the chain of custody is lacking, then the evidence should not be admitted unless other appropriate means demonstrate the identity and integrity of the evidence. Id. In establishing the chain of custody, the State is not required to call as a witness every person who handled the evidence or to establish the identity of the evidence beyond all possibility of doubt or to exclude every possibility of tampering. Id.

We review challenges to the chain of custody of evidence under the abuse of discretion standard. Cannon, 254 S.W.3d at 295 (citing State v. Scott, 33 S.W.3d 746, 752 (Tenn. 2000)); State v. Beech, 744 S.W.2d 585, 587 (Tenn. Crim. App. 1987). Accordingly, this court will not reverse the trial court's ruling on the chain of custody "unless the trial court 'applied an incorrect legal standard, or reached a decision which is against logic or reasoning that caused an injustice to the party complaining.'" Cannon, 254 S.W.3d at 295 (quoting State v. Shirley, 6 S.W.3d 243, 247 (Tenn. 1999)).

We agree with the State that the Defendant has waived appellate review of this issue for failure to preserve this issue in his motion for new trial. See Tenn. R. App. P. 36(a). This court may review issues normally considered waived pursuant to the plain error doctrine. See Tenn. R. App. P. 36(b); Hatcher, 310 S.W.3d at 808. However, we conclude that plain error review is not appropriate. Both victims testified that the silver handgun at trial looked like the one the Defendant used during the robbery. Lieutenant Pugh identified the gun as the one recovered from the black bag found near the crime scene. Furthermore, Officer Atkins testified that the blue hat admitted into evidence was the same hat he took from the Defendant upon his arrest. Moreover, both victims identified the Defendant and the co-defendant as the men who robbed them at gunpoint. Thus, the Defendant is not entitled to relief regarding this issue because he has failed to establish that an error breached a clear and unequivocal rule of law or affected a substantial right of the Defendant.

*IV. Tennessee Rule of Evidence 403*

The Defendant argues that Lieutenant Pugh's testimony referencing other robberies violated Tennessee Rule of Evidence 403 and that the trial court erred in failing to give a curative instruction regarding the testimony. The Defendant argues that he is entitled to plain error relief in order to do "substantial justice and protect [the] Defendant's rights." The State responds that the Defendant has waived review of this issue because the Defendant "did not object contemporaneously to this testimony, request any curative instruction, or otherwise attempt to preserve the issue in his motion for new trial." Furthermore, the State argues that plain error review is not merited. We agree with the State.

The following colloquy occurred when the co-defendant's counsel cross-examined Lieutenant Pugh:

Q. [Y]ou said there had been several robberies in [the area near the Watkins Express Gas Station].

A. There have.

Q. So it's a high crime area?

A. There had been several specific robberies at that location with those suspects mentioned, the exact – with the same similar MO if you would say, so we were patrolling that area.

Q. So there were similar robberies and the MO being two persons, young black male?

A. Something similar to that, yes, ma'am.

Q. And the description that you received when they brought you – when the victims brought you to that location and they said that's the house, right? What was the description you were looking for?

A. Two . . . black[] [males] . . . wearing dark clothing, with that dark skull cap and a blue skull cap.

Q. Okay. Anything more specific than that?

A. No, ma'am.

-14-

The general admissibility of evidence is governed by Tennessee Rules of Evidence 401 and 403. Under these rules, the trial court must determine, first, whether the evidence offered is relevant. Evidence is deemed relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Although relevant evidence is generally admissible, see Tennessee Rule of Evidence 402, it "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence[,]" see Tenn. R. Evid. 403; State v. Banks, 564 S.W.2d 947, 950-51 (Tenn. 1978).

The term "unfair prejudice" has been defined as "[a]n undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." Banks, 564 S.W.2d at 950-51. This court has also stated that "[p]rejudice becomes unfair when the primary purpose of the evidence at issue is to elicit emotions of 'bias, sympathy, hatred, contempt, retribution, or horror.'" State v. Collins, 986 S.W.2d 13, 20 (Tenn. Crim. App. 1998) (quoting M. Graham, Handbook of Federal Evidence, 182-83 (2d ed. 1986)).

In this case, the Defendant failed to raise a contemporaneous objection or request any curative instruction. Furthermore, the Defendant did not include this issue in his motion for new trial. Thus, he has waived appellate review. Furthermore, the Defendant is not entitled to plain error review. The officer said nothing to link the Defendant to the earlier robberies. The officer only referenced two black males; thus, there is no prejudice and a substantial right of the Defendant has not been affected.

### V. Closing Argument

The Defendant contends that the prosecutor and trial court made improper comments during closing arguments. Specifically, the Defendant argues that the prosecutor inappropriately implied that the Defendant "could have retrieved the surveillance video" from the Watkins Express Gas Station. Furthermore, the Defendant argues that the trial court made improper comments while giving a curative instruction in response to the co-defendant's objection to the prosecutor's rebuttal argument. The State responds that, even though the co-defendant objected to the rebuttal argument, the Defendant has waived review of this issue by failing to raise a contemporaneous objection.

During closing arguments, counsel for the Defendant argued that the State failed to provide enough evidence that the Defendant and his co-defendant were the two individuals who committed the robbery. Defense counsel called attention to the fact that

the State failed to present a video recording of the events that transpired at the Watkins Express Gas Station. During the State's rebuttal, the prosecutor argued as follows, "Where's the video? I ask you to recall back to your civics classes or social studies classes when we studied the Sixth Amendment. The defendant is entitled to procure witnesses that will assist in his . . . ." At this point, co-defendant's counsel objected to burden shifting. Following a bench conference, the trial court ruled that the prosecutor was not shifting the burden of proof to the Defendant and stated, "I will give a curative instruction to the jury[,] and I will tell them that there is certain evidence that's equal to both sides and you don't have to bring it." The trial court allowed the prosecutor to make her argument and gave the following curative instruction:

> Sometimes there's proof in a case that either side could put on. Neither side has to put it on but they can if they wish. If there's a witness available equally to both sides, the defense can argue that the State could have called that witness and they could have. The defense could also have called that witness. And so it's up to either side if they wish to put on proof that they can.

> However, the defense doesn't have to put on any proof. If [the Defendant or the co-defendant] wanted to, we could start this trial – we would enter a plea. They don't have to give any opening statements. Neither one of them has to ask any questions of any witness. They don't have to give closing arguments. They don't have to do anything but just be present. So the State has the burden of proof.

> And I'm going to reread this one section in your [jury] charge. It says burden of proof: The State has the burden of proving the guilt of each defendant beyond a reasonable doubt, and this burden never shifts but remains on the State throughout the trial of the case. A defendant is not required to prove his innocence.

> So [the prosecutor] is allowed to argue to you that she thinks if they wish, the defense can put on certain proof[,] too. But you need to understand, they don't have the duty to prove themselves not guilty or innocent. The State has to prove their guilt. They don't have to prove their innocence, but if they want to put on proof they can.

Following this curative instruction, the prosecutor again asked, "So where is the video? . . . Where is the video if it's that crucial to [the defense]?"

First, we must determine if the Defendant waived review of the issues regarding the prosecutor's comments and the trial court's curative instruction by failing to raise a contemporaneous objection. We note that the co-defendant objected to the State's remarks but that the Defendant did not join in the co-defendant's objection.

In State v. Bashan Murchison, No. E201401250CCAR3CD, 2016 WL 659844 (Tenn. Crim. App. Feb. 12, 2016), a panel of this court held that the defendant waived review of his issue regarding a statement used to refresh the recollection of a witness for failing to object; however, the court still addressed the merits of the issue. This court explained, "[w]hile counsel for [the co-defendant] did object to the use of the statement, this does not preserve appellate review of the issue for [the defendant]." Id. at *18 (citing State v. Thomas, 158 S.W.3d 361, 400-01 (Tenn. 2005) (holding that "the objection by a co-defendant fails to preserve the issue on appeal for [d]efentant[,]" but, despite waiver, addressed the merits of the issue.)). Furthermore, because "the purposes behind requiring an objection are served by one party's objection, the better reasoned cases hold that one party's objection preserves appellate review for other co-parties." Neil P. Cohen, et al., Tennessee Law of Evidence § 1.03[4][e] at 1-21 (6th ed. 2011).

Similarly, we hold that, under the facts of this case, the co-defendant's objections to the prosecutor's remarks failed to preserve the issue for the Defendant's appeal; however, we will address the issue. The co-defendant's counsel raised a simultaneous objection, and the prosecutor's comments similarly affected both defendants. The Defendant could not have expected a different ruling from the trial court by also voicing his objection. The Defendant included his objection to the prosecutor's comments in his motion for new trial. Thus, we will address the merits of the issue regarding the prosecutor's comments.

However, the Defendant has waived review of his objection to the trial court's curative instruction to the jury for failing to raise a timely objection. See Tenn. R. Evid. 103(a). Neither the Defendant nor the co-defendant objected to the trial court's instruction, and there was never a ruling on the record regarding the issue by the trial court. Thus, any issue with the curative instruction is waived.

Our supreme court has consistently opined on prosecutorial misconduct regarding closing arguments as follows:

> The basic purpose of closing argument is to clarify the issues that must be resolved in a case. State v. Banks, 271 S.W.3d 90, 130 (Tenn. 2008). While "argument of counsel is a valuable privilege that should not be unduly restricted," Smith v. State, 527 S.W.2d 737, 739 (Tenn. 1975), "such . . . arguments must be temperate, based upon the evidence

-17-

introduced at trial, relevant to the issues being tried, and not otherwise improper under the facts or law." State v. Goltz, 111 S.W.3d 1, 5 (Tenn. Crim. App. 2003); Coker v. State, 911 S.W.2d 357, 368 (Tenn. Crim. App. 1995); see also State v. Middlebrooks, 995 S.W.2d 550, 557 (Tenn. 1999). Because closing argument affords an opportunity to persuade the jury, 11 David L. Raybin, Tennessee Practice: Criminal Practice and Procedure § 29.2, at 97 (2008), leeway should be given regarding the style and substance of the argument. Banks, 271 S.W.3d at 131; State v. Cauthern, 967 S.W.2d 726, 737 (Tenn. 1998). Hence, counsel may employ "forceful language in their closing arguments, as long as they do not stray from the evidence and the reasonable inferences to be drawn from the evidence." Banks, 271 S.W.3d at 131.

State v. Sexton, 368 S.W.3d 371, 418-19 (Tenn. 2012).

The court has also advised that a criminal conviction should not be lightly overturned solely on the basis of the prosecutor's closing argument. Banks, 271 S.W.3d at 131 (citing United States v. Young, 470 U.S. 1, 11-13 (1985); State v. Bane, 57 S.W.3d 411, 425 (Tenn. 2001) (holding that a prosecutor's improper closing argument does not automatically warrant reversal)). "An improper closing argument will not constitute reversible error unless it is so inflammatory or improper that it affected the outcome of the trial to the defendant's prejudice." Id. (citing State v. Thacker, 164 S.W.3d 208, 244 (Tenn. 2005) (appendix); State v. Cribbs, 967 S.W.2d 773, 786 (Tenn. 1998)); see also State v. Reid, 164 S.W.3d 286, 321 (Tenn. 2005).

Here, the prosecutor's argument was not a mistatement of the law because the prosecutor did not reverse the burden of proof. During closing argument, defense counsel specifically called into question the State's failure to produce a video recording from the Watkins Express Gas Station. The prosecutor's comments during rebuttal argument were a response to the Defendant's assertion that the State failed to put on enough evidence to prove the guilt of the defendants. The prosecutor simply stated that the Defendant can summon witnesses and offer proof if he wishes. Moreover, the trial court gave a curative instruction to the jury, which reinforced the fact that the burden of proof remains with the State. The trial court stated, "The State has the burden of proving the guilt of each defendant beyond a reasonable doubt, and this burden never shifts but remains on the State throughout the trial of the case. A defendant is not required to prove his innocence." Therefore, the Defendant is not entitled to relief on this issue.

*VI. Consecutive Sentencing*

The Defendant contends that the trial court erred in sentencing the Defendant consecutively. Specifically, he argues that "the trial court did not conclude that the evidence ha[d] established that the aggregate sentence [was] reasonably related to the severity of the offenses and necessary in order to protect the public from further criminal acts." The State responds that "the order for consecutive sentencing is firmly rooted in relevant portions of the Sentencing Act, and substantial evidence supports the trial court's findings as to those relevant statutory provisions." We agree with the State.

The Sentencing Reform Act was enacted in order "to promote justice" by ensuring that every defendant "be punished by the imposition of a sentence justly deserved in relation to the seriousness of the offense." Tenn. Code Ann. § 40-35-102. In order to implement the purposes of the Sentencing Reform Act, trial courts must consider several sentencing principles. The sentence imposed for an offense "should be no greater than that deserved for the offense committed" and "should be the least severe measure necessary to achieve the purposes for which the sentence is imposed." Tenn. Code Ann. § 40-35-103(2), (4). Thus, before a trial court imposes a sentence upon a convicted criminal defendant, it must consider: (a) the evidence adduced at the trial and the sentencing hearing; (b) the presentence report; (c) the principles of sentencing and arguments as to sentencing alternatives; (d) the nature and characteristics of the criminal conduct involved; (e) evidence and information offered by the parties on the enhancement and mitigating factors set forth in Tennessee Code Annotated sections 40-35-113 and 40-35-114; (f) any statistical information provided by the Administrative Office of the Courts as to Tennessee sentencing practices for similar offenses; and (g) any statement the defendant wishes to make in the defendant's own behalf about sentencing. Tenn. Code Ann. § 40-35-210(b).

When an accused challenges the length and manner of service of a sentence, this court reviews the trial court's sentencing determination under an abuse of discretion standard accompanied by a presumption of reasonableness. State v. Bise, 380 S.W.3d 682, 707 (Tenn. 2012). This court will uphold the trial court's sentencing decision "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." Bise, 380 S.W.3d at 709-10. Moreover, under such circumstances, appellate courts may not disturb the sentence even if we had preferred a different result. See State v. Carter, 254 S.W.3d 335, 346 (Tenn. 2008). Further, "[s]o long as a trial court properly articulates reasons for ordering consecutive sentences, thereby providing a basis for meaningful appellate review, the sentences will be presumed reasonable and, absent an abuse of discretion, upheld on appeal." Id. at *9; (citing see Tenn. R.Crim. P. 32(c)(1) ("The order [for consecutive sentences] shall specify the reasons for this decision and is reviewable on appeal."); see also Bise, 380 S.W .3d at 705.) The burden of showing that a sentence is

improper is upon the appealing party. <u>See</u> Tenn. Code Ann. § 40-35-401, Sentencing Comm'n Cmts.; <u>see also</u> <u>State v. Arnett</u>, 49 S.W.3d 250, 257 (Tenn. 2001).

After reviewing the presentence report, arguments by counsel, and Ms. Fleming's testimony, the trial court reasoned as follows:

> Well, looking at the [statutory mitigating] factors . . . . I find that he does have a prior aggravated robbery conviction, which means he gets no parole on this one. I find he has two requisite felony convictions. The aggravated robbery and the aggravated burglary, so he is Range 2.
>
> . . . .
>
> [The Defendant] has a previous history of criminal convictions in addition to those necessary to establish the appropriate range for those crimes other than the aggravated burglary and the aggravated robbery. That's enhancement factor one.
>
> I also find to a certain extent that he was a leader in the commission of the offense involving two or more criminal actors, which the State didn't check, but which I find. I also find enhancement factor that before trial or sentencing he's failed to comply with the condition of a sentence involving a release into the community. Meaning an aggravated robbery or using crack whatever while on probation for felony offenses.
>
> That the Defendant possessed or employed a firearm, explosive device or other deadly weapon during the commission of the offense I cannot use because a firearm is a necessary element in aggravated robbery and also in convicted felon carrying the firearm. So I cannot find, even though it's true, I cannot find [e]nhancement [f]actor [nine].
>
> In mitigation we have his upbringing. His mother's testimony. It's kind of hard for me to say it's mitigating that he wanted to take a plea and couldn't. I don't know that that's been proved, but nevertheless I don't think we should use that as a strong mitigating factor.
>
> So I'm going to show him sentenced to [fifteen] years in the Department of Correction[] as a Range 2 violent offender, one hundred percent sentence.
>
> I've got the firearms charge which is [three] to [fifteen] years. He's looking at [six] to [ten] on that. We're going to show a – well, ordinarily

he would show it was an eight year sentence. Given those enhancement factors and little mitigation the evading arrest [eleven] months and [twenty-nine] days.

Looking at the State asking that we run his two [fifteen]-year aggravated robbery convictions consecutively that would be [thirty]-years without parole. I think that would be a little too much time for these offenses. So what I'm going to do is I'm going to run those sentences concurrently and I'm going to reduce his firearm sentence to [six]-years and run it consecutively.

The reason I'm running it consecutively is because I find that he's a professional criminal. He's – I don't see any work, any attempt to work to prove himself. He's a dangerous offender. He hasn't fired a shot – I don't know the facts of his first aggravated robbery, but no hesitation about committing a crime in which the [risk to] human life is high. It's not – I can't use it as an enhancement factor but it's just there as far as consecutive sentences.

I think the next time this man gets out and refuses to work and stays high on drugs he's going to end up taking somebody's life and there will be some other child growing up without a dad.

So we're going to show Counts 1 and 2 concurrent [fifteen]-years at one hundred percent and concurrent with Count 4 evading arrest [eleven] months [twenty-nine] days, but consecutive to [six]-years Range 2 although it would be eight years. That's just a little too much. We're going to show [six]-years consecutive. For a total sentence of [twenty-one]-years in the Department of Correction[].

Tennessee Code Annotated section 40-35-115(b) provides that a trial court should consider the following criteria in determining whether to impose consecutive sentencing:

(1) The defendant is a professional criminal who has knowingly devoted the defendant's life to criminal acts as a major source of livelihood;

(2) The defendant is an offender whose record of criminal activity is extensive;

(3) The defendant is a dangerous mentally abnormal person so declared by a competent psychiatrist who concludes as a result of an investigation prior to sentencing that the defendant's criminal conduct has been characterized

-21-

by a pattern of repetitive or compulsive behavior with heedless indifference to consequences;

(4) The defendant is a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high;

(5) The defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim or victims, the time span of defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim or victims;

(6) The defendant is sentenced for an offense committed while on probation; or

(7) The defendant is sentenced for criminal contempt.

Id. The trial court may impose consecutive sentencing upon finding the existence of any one of the criteria contained in Tennessee Code Annotated section 40-35-115(b).

We conclude that the Defendant's sentence complies with the purposes and principles of the Sentencing Reform Act. In determining the Defendant's sentence, the trial court considered the Defendant's presentence report and his criminal history. The trial court acknowledged the dangerousness of the Defendant's crime and expressed a need to protect the public from the Defendant's potential behavior. The trial court also considered the Defendant's mother's mitigating testimony regarding the Defendant's difficult upbringing, but determined that a consecutive sentence was necessary for the Defendant. Thus, the Defendant is not entitled to relief, and we will uphold the trial court's sentence.

## CONCLUSION

Based upon the foregoing, the judgments of the trial court are affirmed.

_____
D. KELLY THOMAS, JR., JUDGE

-22-